IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |  |
|---|---|---|
| IRVINE JOHNSTON KING, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Criminal No. 1:12-cr-00180-1 |
| v. | ) | |
| | ) | Civil No. 1:15-cv-00811 |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION**

THIS MATTER comes before the Court on Petitioner Irvine Johnston King's, ("Petitioner") Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255.

Irvine Johnston King and Aisha Rashidatu King (collectively, "the Kings") owned and operated Bright Beginnings Healthcare Services, Inc. ("Bright Beginnings"), a home health care business located in Woodbridge, Virginia. Bright Beginnings provided nurses and nursing aides to approximately twenty-five Medicaid patients and a few patients covered by private health insurance.

The company was to submit claims to Medicaid and other insurers stating the number of hours it provided patient services, along with other information, including the dates and modes of service. Bright Beginnings was required to complete and maintain documentation including records signed by the nurse or

aide who rendered a given service, along with the patient (or patient's family member) who confirmed the records' accuracy. Instead, Bright Beginnings repeatedly submitted inflated claims for services that were never provided.

In May 2009, an outside firm retained by Virginia Medicaid audited Bright Beginnings. The audit included a multi-day visit to Bright Beginnings' office to review patient files for documentation supporting the claims. During the on-site visit, three auditors reviewed 501 pages of nursing documentation for a total of six Bright Beginnings patients. After matching those six patients' Medicaid claims with the supporting documentation that Bright Beginnings provided the auditors during the onsite visit, the auditing firm made a preliminary report regarding apparent discrepancies. The firm gave Bright Beginnings an opportunity to submit additional records. Bright Beginnings submitted an additional 114 pages of documents to substantiate the Medicaid claims submitted for the six patients. The records appeared fabricated: the supplemental records contained signature blocks bearing identical photocopied signatures from patients and their family members.

The auditors notified Bright Beginnings that the audit revealed that Medicaid had overpaid Bright Beginnings by approximately $435,000 for services related to the six patients at issue. The notice advised Bright Beginnings that it could

2

appeal the finding. Mr. King, on behalf of Bright Beginnings, informed the auditors that the company wished to appeal the finding.

In April 2010, 11 months after the initial visit, Bright Beginnings provided the auditors an additional 1907 pages of documents—nearly four times what was initially provided to the auditors. This additional production included records that also bore indicia of fraud: repetitive summaries of nurses' observations of patients for different visits on different days, supposedly written by different nurses; nursing documentation intended to back up the summary forms collected during the on-site visit that included start and end times that did not correspond with those summary forms; time sheets reflecting 16 hours of daily patient services supposedly provided by Mrs. King herself; and signature blocks bearing the identical photocopied signature of patients or their family members.

During a search of Bright Beginnings, the Government discovered an array of physically manipulated records, including documents with notations in ink while signatures were photocopied, photocopied signatures taped over signature lines, whited-out signatures and dates on signature lines, whited-out headers and footers, and sections that had been cut out.

This case was originally prosecuted by the Office of the Attorney General for the Commonwealth of Virginia and was

3

subsequently charged federally. On June 28, 2012, the grand jury indicted the Kings, charging both individuals with one count of conspiracy to commit health care fraud and two counts of aggravated identity theft in violation of 18 U.S.C. § 1028A along with 22 and 13 counts, respectively, of health care fraud in violation of 18 U.S.C. §1347.

On January 10, 2013, the jury found the Kings guilty on all counts. On March 22, 2013, the District Court sentenced each defendant to a term of imprisonment of 121 months—97 months for the conspiracy and health care fraud counts, the low end of the sentencing guidelines range, and a mandatory, consecutive 24 months for the two aggravated identity theft counts-followed by three years of supervised release. The Court also ordered the Kings jointly and severally pay restitution in the amount of $931,894.16. The Court entered consent orders of forfeiture in the same amount.

On March 28, 2013, the Kings each filed notice of appeal. The Kings' current counsel represented them on appeal. The Kings argued "that the district court erred in responding orally to the jury's request for a written copy of the jury instructions pertaining to the statutory elements of the Kings' offenses." On December 6, 2013, the Fourth Circuit Court of Appeals affirmed this Court's judgment. The mandate took effect on December 30, 2013. On March 11, 2014, the Kings filed a writ of certiorari

4

before the Supreme Court of the United States. The writ of certiorari was denied on June 30, 2014.

Petitioner filed the instant Motion to Vacate under 28 U.S.C. § 2255 on June 24, 2015. On June 29, 2015, Petitioner filed his amended Motion to Vacate. On October 2, 2015, this Court ordered the Government to respond. On October 23, 2015, the Government moved this Court to compel affidavits from the Kings' former counsel. On November 3, 2015, this Court ordered the Kings' former counsel to file an affidavit. Also on November 3, 2015, Petitioner filed a motion to modify the order, which the Government opposed on November 13, 2015. The Court denied the motion to modify on November 16, 2015, and the Government was granted an extension to file its response on December 23, 2015.

A petitioner attacking his conviction or sentence pursuant to 28 U.S.C. § 2255 bears the burden of proving that at least one of four grounds justify relief: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States;" (2) "that the court was without jurisdiction to impose such sentence;" (3) "that the sentence was in excess of the maximum authorized by law;" or (4) that the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a) (2008). The catch-all fourth category of non-jurisdictional, non-constitutional errors are cognizable under § 2255 only where the alleged error presents either "a fundamental defect which

inherently results in a complete miscarriage of justice," "an omission inconsistent with the rudimentary demands of fair procedure," or other "exceptional circumstances" that make the need for remedy apparent. See Hill v. United States, 368 U.S. 424, 428 (1962).

A motion pursuant to § 2255 "may not do service for an appeal." United States v. Frady, 456 U.S. 152, 165 (1982) (internal citation omitted); see also Dragonice v. Ridge, 389 F.3d 92, 98 (4th Cir. 2004) (citing Frady, 456 U.S. at 164-65). Errors that should have been raised at trial or on direct appeal, but were not, are procedurally defaulted. Frady, 456 U.S. at 167-68.

There are three exceptions to the well-established procedural default rule. First, procedural default will not act as a bar to collateral relief where a petitioner demonstrates cause for the procedural default and actual prejudice therefrom. Frady, 456 U.S. at 167. Such an error must work to the "actual and substantial disadvantage" of the petitioner—not merely create a possibility of prejudice. Murray v. Carrier, 477 U.S. 478, 494 (1986) (quoting Frady, 456 U.S. at 170). Second, procedural default will not act as a bar where a petitioner can demonstrate actual innocence in either a capital case or a case in which a recidivist sentencing enhancement was applied. United States v. Mikalajunas, 186 F.3d 490, 494-95 (4th Cir.

6

1999). Third, procedural default will not act as a bar where a petitioner brings a claim of constitutionally ineffective assistance of counsel. United States v. DeFusco, 949 F.2d 114, 120-21 (4th Cir. 1991).

In Strickland v. Washington, the U.S. Supreme Court held that the Sixth Amendment right to counsel includes the right to the effective assistance of counsel. 466 U.S. 668, 686 (1984). To establish a claim for ineffective assistance of counsel, a defendant must prove both that his counsel's conduct fell below an objective standard of reasonableness and that the deficient performance caused the defendant actual prejudice. Id. at 687-88, 691-92. "The defendant bears the burden of proof as to both prongs of the [Strickland] standard." United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010).

Under Strickland, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" 466 U.S. at 689. The Strickland standard is highly deferential to counsel. Id. at 686, 689, 690. The evaluation of a defense counsel's performance is made from his or her perspective at the time of the alleged error and in the light of all circumstances. Id. at 690.

7

To satisfy the second prong of the Strickland test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In other words, a defendant must affirmatively prove prejudice that is so serious as to have deprived him of a fair trial, a trial whose result is unreliable. See id. at 693.

"Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Strickland, 466 U.S. at 700. Because "[t]he defendant bears the burden of proving Strickland prejudice," if a defendant fails to meet this burden, "a reviewing court need not consider the performance prong." Fields v. Attorney General of Maryland, 956 F.2d 1290, 1297 (4th Cir. 1992) (citing Strickland, 466 U.S. at 697).

Petitioner claims to have received ineffective assistance of counsel because defense counsel did not "cross-examine the Government's witnesses to establish who actually benefitted from overpayments, nor did they emphasize the lack of such evidence in opening or closing statements." Had defense counsel "followed the money," Petitioner argues, the trail would not have led to the Kings; they would have been shown to have

8

insufficient intent to commit the fraud.

Again, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. See Strickland at 689-90; Terry, 366 F.3d at 316-18, cert. denied, 543 U.S. 983 (2004). For a petitioner to overcome this presumption, "the analysis of counsel's performance typically must be comprehensive; i.e., not narrowly limited to a review of counsel's failings." See Strickland, 466 U.S. at 689. The Supreme Court cautioned that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." Id. The Court noted particularly that the reasonableness of counsel's actions often depends on "informed strategic choices made by the defendant and on information supplied by the defendant." Id. at 691.

Here, Petitioner does not offer any exhibits or other evidence in support of this argument. The record makes clear that the trail of fraudulent money leads directly to the Kings, and that they benefited from the fraud. The Kings jointly owned Bright Beginnings, which received payment from Virginia Medicaid when claims (fraudulent or otherwise) were submitted. As set forth in the forfeiture order, the amount paid by Virginia Medicaid for the claims submitted by Bright Beginnings was $766,620.43. Bright Beginnings received an additional $165,273.73 for claims submitted to and paid by Blue

9

Cross Blue Shield, for a total of $931,894.16.

In making the argument that the Kings received ineffective assistance of counsel for failure to cross-examine witnesses with respect to who benefited from the fraud, the Kings actually highlight an example that contradicts their position. The Kings allege that defense counsel should have focused on whether the nurses benefitted from their overbilled hours, citing the cross examination of FBI Agent Vanderbunt. Petitioner's counsel, Mr. Iweanoge, cross examined Agent Vanderbunt with respect to a summary spreadsheet she created, repeatedly asking whether she considered or included payroll records on the spreadsheet. The Kings now suggest that the nurses also benefitted from the fraud because they were paid for more hours than they worked. Notably, Mr. Iweanoge repeatedly and artfully suggested through cross examination and in closing that others were responsible for and/or benefiting from the fraud. Defense counsel did exactly what they are now accused of not doing.

The Kings next allege that trial counsel did not make explicit or sufficiently develop the inference that others benefited from the fraud, thus providing ineffective assistance. This point does not rise to the level of ineffective assistance. Courts are most deferential to the strategic decisions made by defense counsel during trial. See, e.g., United States v.

10

Strickland, 466 U.S. at 689; see also United States v. Dyess, 730 F.3d 354, 364 (4th Cir. 2013) ("[W]e give counsel wide latitude in determining which witnesses to call as part of their trial strategy"); United States v. Roane, 378 F.3d 382, 400 (4th Cir. 2004) (conclusory claims about hypothetical witnesses provide no grounds for relief); Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998) ("Decisions about what types of evidence to introduce are ones of trial strategy, and attorneys have great latitude on where they can focus the jury's attention and what evidence they can choose not to introduce.")(internal citation omitted).

The evidence presented at trial demonstrates that the Kings were benefactors of the fraud. As sole owners of Bright Beginnings, the Kings received Medicaid payments made to the business. To the extent that insurance payments were not sufficient to make the business profitable, or payments had to be returned to the Medicaid program, the Kings would suffer loss. Any greater focus on who benefited from the fraud would have likely worked against the Kings. See Tucker v. Catoe, 221 F.3d 600, 614-15 (4th Cir. 2000) (counsel is not ineffective for failing to make an argument where there is "no reasonable probability that [it] would have been successful."). As the Government stated in closing,

"There were also office employees, people like Violet

11

> Kincaid, Jody Allen, and Tiffany Ferguson, who performed administrative functions within the office. They weren't the owners. They weren't the ones who had any motive to inflate Bright Beginnings' Medicaid claims. They were the ones who simply received paychecks. But the Kings had a motive, especially when making payroll was tough, and the more they overbilled Medicaid, the more money they put in their pockets."
>
> "They ran the company. When it came to the business' profits, they were the ones who benefited. When it came to not paying Medicaid back as a result of the audit, they were the ones on the hook for any money owed."

Mr. Iweanoge indicates that he believed this strategy would have been to his client's detriment. Emphasizing where the money went would have emphasized his client's motive to commit the fraud.

Defense counsel thoroughly cross examined each of the Government's twenty-two witnesses. Mr. Iweanoge used cross examination effectively to undermine witness credibility, highlight inconsistencies between witnesses' attempt to blame employees, and suggest that the billing was in error due to disorganization rather than deliberate fraud, demonstrate how confusing and complicated billing and documentation could be, and more. In doing so, they demonstrated familiarity with documents, witnesses, and a complex regulatory scheme. Petitioner's allegations that trial counsel should have focused elsewhere are without merit. There is no showing (or likelihood, based on the record) that the strategy they now promote would

have had a reasonable probability of a better outcome at trial.

Petitioner alleges that he was provided constitutionally deficient assistance of counsel at the plea stage based on the following purported failures: "(a) failing to adequately apprise [the Kings] of the apparent strength of the prosecution's case, (b) failing to adequately inform them of the sentence they would likely face if found guilty of the charges against them, and (c) only belatedly informing the Kings of the terms of the Government's offer." Each of these arguments is without merit.

The Government offered the Kings several plea offers. Each was rejected. The Kings never allege that their counsel failed to inform them of the plea offers, advised them to go to trial rather than accepting any of the plea offers, or miscalculated or misrepresented their probability of a favorable outcome at trial. Each of the three defense counsel the Kings engaged to assist them in this matter indicate in their affidavits that they advised the Kings to accept each of the pleas being offered, but ultimately (and properly) left the decision to the Kings.

The Kings cannot allege ineffective assistance of counsel during plea negotiations where the undisputed evidence is that the Kings were offered favorable pleas, their counsel informed them of those pleas and advised them to accept those favorable pleas, and their counsel did not overstate their chances of success at trial. There is nothing in the record to suggest that

13

the Kings would have made a different decision as to the various pleas offered to them, and nothing to indicate the "reasonable probability" necessary to clear the hurdle posed by Strickland's prejudice prong. The Kings were advised to accept several plea offers. They rejected each one against their counsels' advice. That they now regret their decision is insufficient grounds for relief.

The Kings first allege that their counsel did not review the evidence against them in advising them as to the wisdom of accepting the plea offer. This allegation, supported only by a conclusory statement to that effect in each of the Kings' affidavits, is baseless and factually inaccurate. Mr. Iweanoge reviewed the evidence extensively and involved two of his investigators in the case. He met with Petitioner while Petitioner was detained and discussed evidence before the matter was ever charged federally. He again reviewed the documents before trial in late 2012, the dates of which are corroborated by the Government's records. Petitioner's counsel did investigate the matter and review the evidence in his case.

However, the Court need not make a factual determination about how much evidence counsel reviewed and whether that was sufficient. It is undisputed that the Kings' counsel advised them, based on however much or little evidence they had examined, to accept a favorable plea offer rather than go to trial. The

Kings offer in support that ABA Standards state "[d]efense counsel should not recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed" and that "counsel must avoid overconfident assurances to clients." Notably, the Kings do not allege that their counsel advised them that the evidence against them was sparse or that they had a good chance (or any chance) of overcoming the Government's evidence at trial. Thus, it is undisputed that the Kings were advised to accept the plea because the evidence against them was strong. To allege prejudice, the Kings would need to show that but for the ineffective assistance they allege, there would have been a reasonable probability of a different outcome. Where the Kings do not allege that they were advised to go to trial by any counsel at any point in the plea negotiation or litigation of this case, they cannot demonstrate the probability of a different outcome.

In support of their ineffective assistance claim as to plea negotiations, the Kings also allege that they apprised their lawyers of witnesses to interview, and that their counsel did not do so. To the extent the Kings assert that their counsel did not adequately review the evidence so as to effectively advise them as to the strength of the case against them, as discussed above, the Kings cannot show any prejudice from this alleged failure. To the extent the Kings intend to support a claim that the Kings

15

did not receive adequate assistance at trial, the claim is meritless. The Kings each allege in their affidavits that these individuals were "principally former employees" of Bright Beginnings. The Kings do not provide names of any other individuals about whom they told their lawyers or what evidence those individuals might have offered on their behalf at trial. The Kings specifically name only Kadiatu Richardson, who "could testify that a star Government witness, Nenneh Blell, had lied [to the Kings] that she was actually Ramatou Fofana, a licensed nurse." The Kings appear to allege that as a result, their trial counsel missed the opportunity to impeach Nenneh Blell and did not use the information they provided. Both defense counsel extensively cross-examined and impeached Nenneh Blell. Mr. Iweanoge used the information received from Kadiatu Richardson during his extensive cross of Blell. That trial counsel did not call a specific witness to provide additional impeachment of Blell is a matter of trial strategy. See United States v. Roane, 378 F.3d 382, 400 (4th Cir. 2004) (conclusory claims about hypothetical witnesses provide no grounds for relief). The Kings' allegations as to their lawyers' failure to interview or call witnesses on their behalf are conclusory and without merit.

The Kings allege that during plea negotiations, because their attorneys did not inform them of the sentence they would likely face if they went to trial, they were unable to consider

16

the plea agreement's comparative merit. The plea negotiations the Kings appear to be referencing all took place before a complaint or indictment was filed in this case. Each of the three defense counsel affirms that they informed the Kings of the favorable nature of the plea agreement(s). At the time the plea offers at issue here were extended, counsel could not have definitively stated what charged the Kings might face if the Government indicted—for example, how many substantive health care fraud counts might be included, or how many counts of aggravated identity theft. They could, however, have given the Kings a good sense of how advantageous a plea agreement would be compared to what they could be exposed to at trial—and they did so.

Petitioner alleges that she did not know that they would lose the Government's support for staggered sentencing if they did not accept the plea offer. The Kings appear to be offering this perspective to demonstrate that they received ineffective assistance during plea negotiations and were not fully aware of how favorable the terms could be. Mr. Iweanoge affirms that he conveyed to Petitioner how reasonable the plea offer was, and that although he could not know definitively what the charges and potential sentencing outcomes were if the government sought an indictment, they would be much less favorable.

In the email Mrs. King forwarded to Mr. Iweanoge on March 27, 2012, AAG Grist referenced the Government's intent to indict

on additional counts and charges if the plea offer was not accepted, and specifically emphasized the two-year mandatory sentence for aggravated identity theft. Mr. Iweanoge affirms that he informed his client of the two year mandatory consecutive sentence that would apply if the government charged aggravated identity theft, as the government indicated it would. Mr. Iweanoge further stated that even after his client had rejected the favorable plea offer to one felony count of health care fraud, he repeatedly recommended to Petitioner that he accept a plea rather than proceeding to trial, since his sentencing exposure at trial would be significant.

Petitioner indicates that his counsel was "slow" in apprising him of the details of the government's plea offer. It is not clear what Petitioner considers "slow," or how long he believes or knows Mr. Iweanoge was aware of the details of the offer before notifying Petitioner. Petitioner further alleges that his counsel was "slow" in notifying him that his time for considering the plea offer was drawing to a close, and says he only had minutes to make a decision. Petitioner does not offer any details about how long he knew the plea offer was outstanding or how long he had to consider it before he was required to make a decision. The evidence indicates that a plea offer for Petitioner was pending as early as December 1, 2011. Further, it is unclear which of the many plea negotiation

18

discussions the Kings are referencing when they claim that Mr. Iweanoge required them to provide an answer "that day." The Kings were extended a plea offer a plea offer at the state level, after which time they were extended a plea offer at the federal level. Petitioner was offered a plea wherein his total offense level was 21, which corresponded to a guideline range of 37-46 months. Petitioner was given ample time and advised as to the comparative advantage of accepting that plea. When that plea offer expired, the government made it clear that a less favorable (but still advantageous) plea offer was available-a plea to conspiracy as previously offered, with the additional 24 months imprisonment for one count aggravated identity theft. Mr. Iweanoge repeatedly recommended to his client that he accept that plea, rather than proceed to trial.

Counsel discussed each of the plea offers with their respective clients, as corroborated by the affidavits provided by each of the three attorneys for the Kings during the pendency of the federal case. Petitioner had several opportunities to accept a plea. His failure to accept any of them is conclusive evidence that, despite his thoughts in hindsight, he would not have accepted a guilty plea.

Petitioner fails to make the requisite showing of either deficient performance or sufficient prejudice to support a claim of ineffective assistance of counsel. An evidentiary

hearing is unnecessary. Accordingly, this Court must deny Petitioner's motion as substantively and procedurally barred.

An appropriate order shall issue.

*/s/ Claude M. Hilton*
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
January 12, 2016