IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

|  |  |
|---|---|
| IRIVINE JOHNSTON KING, and AISHA RASHIDATU KING, | ) ) ) ) |
| Petitioners, | ) Criminal No. 1:12-cr-180 |
| v. | ) Civil No. 1:15-cv-811, 812 |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

**MEMORANDUM OPINION**

THIS MATTER comes before the Court on Petitioners Irvine Johnson King and Aisha Rashidatu King's Amended Motions to Vacate, Set Aside, or Correct Sentence and for New Trial Pursuant to 28 U.S.C. § 2255.

The Petitioners were the subjects of state and federal charges related to their operation of a home health agency called Bright Beginnings. The state charges were brought first, following a Medicaid audit by the Commonwealth of Virginia. Irvine King was detained pending trial on the state charges. On May 31, 2012, a criminal complaint was filed in the Eastern District of Virginia charging the Petitioners with conspiracy to commit healthcare fraud in violation of 18 U.S.C. §§ 1347 and 1349. The complaint alleged that the Petitioners had billed for services that were not actually rendered, and/or were not rendered by the provider listed on the billing forms submitted

1

to the Department of Medical Assistance Services ("DMAS"), the agency that administers the Medicaid program in Virginia.

On June 28, 2012, a federal grand jury returned a 25-count indictment against the Petitioners, charging them with one count of conspiracy to commit health care fraud, twenty-two substantive counts of health care fraud, and two counts of aggravated identity theft. During the proceedings, the Petitioners retained the services of several attorneys. John Iweanoge represented Irvine in both the federal and state cases. Aisha originally retained Gretchen Taylor in her state case, but fired Ms. Taylor after the federal charges were brought. Aisha then hired and fired several more attorneys, including Abu Kalokoh and Michael Pritchard. Aisha eventually hired Michael Khouri, a criminal defense attorney who specializes in healthcare fraud cases, to represent her at trial.

The Petitioners' arraignment was originally set for July 6, 2012. The day after the indictment was returned, Aisha's attorney, Mr. Pritchard, filed a motion to withdraw. Mr. Pritchard noted that he was hired to engage in "pre indictment defense of the charges" and "plea negotiations related to those charges," and that Aisha had not retained him for trial. Mr. Pritchard also stated that Aisha was not adequately assisting in the defense and had not followed his reasonable instructions, thus causing Mr. Pritchard's further representation of Aisha to

be combative and counterproductive. The Court held a hearing on the motion to withdraw on July 6, 2012, at which time Aisha informed the Court that she had retained new counsel, Michael Khouri. The Court granted Mr. Pritchard's motion to withdraw. John Iweanoge agreed to serve as local counsel for Aisha.

Mr. Khouri and Mr. Iweanoge represented Aisha at her arraignment on July 27, 2012. Mr. Iweanoge represented Irvine at his arraignment on July 30, 2012. After a three day trial in January 2013, the jury returned a verdict of guilty on all counts for Irvine and on counts 1 and 11-25 for Aisha. On March 22, 2013, the Court sentenced the Petitioners to 121 months' imprisonment and 3 years of supervised release. In addition to special assessments, the Petitioners were ordered to pay $931,894.16 in restitution, the actual fraud loss associated with the health care conspiracy.

The Petitioners appealed, and the Fourth Circuit affirmed the convictions and sentences. The Petitioners filed writs of certiorari which were denied on June 30, 2015.

On June 24, 2015, the Petitioners filed timely *pro se* petitions to vacate their convictions and sentences pursuant to 28 U.S.C. § 2255. Subsequently, the Petitioners retained pro bono counsel and filed amended 2255 petitions. These amended petitions alleged that their defense counsel did not advise them about the "strength or weakness of the Government's case"

3

against the Petitioners or inform them about their likelihood of success if they went to trial. They alleged that their defense attorneys did not adequately review the evidence and failed to inform them of the sentences that they might face if they went to trial and were convicted. The Petitioners claimed that they were unaware of the mandatory two-year sentence that they would receive if convicted of aggravated identity theft. They claimed that they would have accepted the government's plea offer if they had been adequately apprised of the "details and strength of the government's case against" them and potential sentencing exposure. A two-day evidentiary hearing on both amended 2255 petitions was held on November 9 and 13, 2017.

The Petitioners' claims that they were unaware of the nature of the charges and the strength of the government's evidence cannot be reconciled with the various pretrial proceedings in this case, their role in Bright Beginnings and the charged offenses, or the testimony at the evidentiary hearing of the various defense attorneys. Both of the Petitioners were present during a lengthy preliminary hearing in state court and during respective preliminary hearings in the federal case. At these hearings, the Commonwealth of Virginia and the United States presented detailed evidence about the charges, the evidence, and the Petitioners' roles in the charged offenses.

Furthermore, the evidence adduced at trial demonstrates that the Petitioners were intimately involved in the fabrication and falsification of the billing and supporting documents submitted to DMAS. The primary evidence against them was the fabricated documents that the Petitioners submitted during the audit, as well as records seized from the Petitioners' business. The Petitioners were therefore aware of the majority of the evidence used against them because they created it.

With regard to Aisha King, the Court had an opportunity to hear her testimony and observe her demeanor at length on direct examination and on cross-examination. Based on her testimony and demeanor, the Court does not credit the claims in her amended 2255 petition that she was not adequately apprised of the strength of the government's case or the evidence against her or that she was not advised of the potential sentence she could receive if she went to trial. The Court instead finds that Aisha was adequately advised during plea negotiations, but nonetheless made an informed decision not to accept any of the plea offers.

The Court also had the opportunity to observe and hear testimony from Aisha's attorney during the state proceedings, Gretchen Taylor. Ms. Taylor testified that she reviewed the state's evidence extensively and met with Aisha on multiple occasions to discuss the case and the evidence, and that Aisha accompanied her to review evidence on at least one occasion.

Multiple witnesses, many of whom later testified at trial, testified at the state preliminary hearing where the Petitioners were present.

In or around December 2011, a wired plea offer was extended to Aisha and Irvine that would resolve both the state and federal cases. The offer required Aisha to plead guilty to a state misdemeanor embezzlement charge in exchange for her cooperation. The offer remained open for three months, and Aisha at no time advised her counsel to accept it. The government ultimately withdrew the offer. Ms. Taylor testified at the evidentiary hearing that there were several reasons Aisha did not accept the offer, including that: Aisha continued to maintain her innocence; Irvine did not want to plead guilty and the pleas were wired; and Aisha faced immigration consequences. Ms. Taylor testified that she did not remember Aisha ever stating that she was guilty, in contrast to Aisha's claims at the hearing that she openly admitted her guilt to defense counsel.

Aisha fired Ms. Taylor and hired Abu Kalokoh to represent her in the federal case. A pre-indictment plea for Aisha was emailed to Mr. Kalokoh on April 19, 2012 ("the April 2012 plea"), which required Aisha to plead guilty to one count of conspiracy to commit healthcare fraud, agree to a fraud loss of $400,000 to $1 million, and receive enhancements for abuse of a

6

position of trust and an aggravating role. The deadline to accept the plea was April 26, 2012.

Mr. Kalokoh forwarded the email containing the plea to Aisha. The Assistant U.S. Attorney expressly warned in the email that any future plea would include an additional charge for aggravated identity theft, and explained that this additional charge "carries a mandatory two-year sentence on top of the sentence given for the predicate offense." Mr. Kalokoh asked Aisha to forward the plea email to John Iweanoge, which she did.

Aisha fired Mr. Kalokoh on April 24, 2012, two days before the April 2012 plea offer was set to expire, and hired Michael Pritchard. Aisha informed Mr. Pritchard about the plea offer, and he obtained a copy of the written offer that was sent to Mr. Kalokoh. Based on discussions with Aisha, Mr. Pritchard negotiated some changes to the plea offer on or about April 25, 2012, which included extending the plea deadline until the end of May. In an email and follow-up call with Aisha that same day, Mr. Pritchard summarized his discussion with the prosecutor, including the revised plea terms and potential consequences of accepting or rejecting the offer.

Throughout the course of his representation, Mr. Pritchard explained to Aisha the nature and strength of the government's case, some of the evidence and facts that would be used by the government, the potential charges, elements of each charge,

sentencing and guideline enhancements, the loss amount, plea deadlines, benefits of the newly negotiated plea terms, and the possible immigration consequences of pleading. These discussions occurred by phone, email, and in person, often with Irvine present. Mr. Pritchard also obtained and reviewed written plea paperwork with Aisha and Irvine. Mr. Pritchard noted that the Petitioners would often become unresponsive when it came time to make a decision or accept a plea offer.

While the plea offer was open, the loss amount calculated by the government continued to increase. Mr. Pritchard informed Aisha whenever the loss amount increased, and explained the consequences of the increase including the potential for a longer sentence. Despite all of the explanations and advice, Aisha did not express a desire to accept the plea offer by the May deadline, and she did not sign the plea paperwork. Aisha was ultimately indicted on federal charges and arrested approximately one week later.

In view of all the evidence, the Court finds that Aisha was fully advised as to the terms of the various plea offers that were extended, the timeline in which to consider each offer, and the potential outcomes of accepting a plea or going to trial. Aisha never admitted or acknowledged any level of guilt prior to the evidentiary hearing, never told any of her attorneys that

she wanted to plead guilty, never signed plea paperwork, and never requested that a plea hearing be scheduled.

Additional evidence is provided by Aisha's original 2255 petition, which she filed under penalty of perjury in June 2015. That petition alleged that Aisha "was advised to plead to invalid law" and that her "counsel gave erroneous advice that [Aisha] plead to the charges." Those allegations clearly contradict her later claims that she was never advised to plead guilty. Aisha testified at the evidentiary hearing that she had received more than one plea offer, and had discussed different plea offers with Gretchen Taylor and Michael Pritchard. She was also able to recite the terms of the original state offer, as well as concerns she had with the loss amount related to the subsequent federal offer. Although Aisha claimed that she was never advised about the impact of the loss amount on her sentence, this claim is directly contradicted by other evidence in the record, including an email from Michael Pritchard to Aisha that stated "the loss value plays a large role in the sentencing guidelines and a reduction in the loss value would result in a lower total offense level (meaning a lower recommended sentencing range)."

Aisha's claim that she had expressed a desire to accept virtually every plea offer extended to her is also contradicted

by the evidence in the record, including the testimony of her attorneys.

The Court also had opportunity to hear the testimony and observe the demeanor of Petitioner Irvine King at length during the evidentiary hearing. Based on his demeanor, what appear to be strategic instances on cross-examination where he could not recall critical facts that would have harmed his case, and inconsistencies between his claims under oath at the evidentiary hearing and the testimony of the Petitioners' counsel, the Court does not credit Irvine's claims that he was not adequately apprised of the strength of the government's case or the evidence against him, or that he was not advised of the potential sentence he could receive if he went to trial. Instead, the Court finds that Irvine was adequately advised during plea negotiations, but chose not to plead guilty for a variety of reasons, including disagreements regarding the loss amount and a belief that he is not guilty of the charged offenses.

Irvine testified that he and Aisha received their first plea offer in or around December 2011, and that he was informed of the plea offer by Mr. Iweanoge. Irvine was able to recall the basic details of the plea offer at the hearing. Irvine claims they "accepted" this offer but that the guilty pleas "did not materialize" before the offer was rescinded.

Irvine also testified that a federal plea offer was extended in April, 2012. He testified that Mr. Iweanoge emailed a copy of the written federal plea to the Petitioners, including the deadline of April 26, 2012. Irvine testified that he and Aisha were concerned about the loss amount in this plea offer, among other issues. Despite initially claiming to have not discussed the plea offer with Mr. Iweanoge, Irvine acknowledged that they had a brief phone discussion concerning the plea offer on April 26, 2012. Irvine also testified that he and Aisha met with Mr. Iweanoge on or around April 26, 2012, and that the Petitioners and Mr. Iweanoge also met with the Assistant United States Attorney and informed him of their desire to accept the offer.

Irvine's testimony confirmed that he received initial drafts of the plea paperwork by email from Mr. Iweanoge and that they had discussed at least receipt of the paperwork by phone. Irvine initially testified that he had never discussed the plea paperwork with Mr. Iweanoge, but later stated that he and Aisha discussed their concerns about the loss number with Mr. Iweanoge and Mr. Pritchard.

Irvine's testimony confirmed that Mr. Iweanoge forwarded him an email from the AUSA on May 16, 2012 with revised plea paperwork attached that included an increased loss amount of over a million dollars, and noted a plea deadline at "the end of

next week." Irvine testified that he could not remember whether he had discussed the terms of this plea offer with Mr. Iweanoge, but that Mr. Iweanoge had advised him that he had a deadline to finalize the paperwork.

After the May 16 plea offer expired, a new plea offer was extended consisting of one count of conspiracy and one count of aggravated identity theft. This offer was emailed by the government to Mr. Iweanoge, who forwarded the email to Irvine.

At the hearing, Irvine confirmed that he received several plea offers, and that Mr. Iweanoge met with him over twenty times while he was incarcerated in Virginia. He acknowledged that he and Aisha were concerned about the immigration consequences Aisha could face if she pleaded guilty. Irvine also confirmed that he had discussed the terms of the original state plea offer with Mr. Iweanoge more than once in advance of the plea expiration date.

Irvine stated on cross-examination that he still did not understand the conspiracy charge or the aggravated theft charge, that it was still his belief that he and Aisha did not commit between $400,000 and $1 million of the loss amount, and that they should not have been ordered to pay over $400,000 in restitution. Irvine also stated on cross-examination that they had wanted staggered sentences, and that none of the plea paperwork he reviewed contained an agreement on staggered

12

sentences. Irvine was unable to testify in detail about his original *pro se* 2255 petition, and he claimed that he only realized he had received ineffective assistance of counsel after his conviction and sentence.

The Supreme Court has adopted a two-part test for analyzing claims of ineffective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). When the claim arises out of the plea process, the petitioner must show that (1) counsel's representation was objectively unreasonable, and (2) the constitutionally ineffective representation actually prejudiced the outcome of the plea process. Id. The Petitioners have failed to demonstrate that any of their five former attorneys provided objectively unreasonable representation, and they have failed to establish actual prejudice.

First, the Petitioners cannot show prejudice. Based on the Petitioners' testimonies and demeanors at the evidentiary hearing, the Court finds that the they still dispute the government's loss amount as well as whether they are truly guilty of conspiracy or healthcare fraud. Due to their continuing disagreement as to their guilt, the Court finds that the Petitioners would not have been able to competently plead guilty to fundamental elements of the charged offenses. None of the Petitioners' former attorneys who testified at the hearing recalled the Petitioners ever admitting their guilt, accepting

responsibility, or expressing a desire to plead guilty. Instead, the testimonies at the hearing consistently demonstrated that the Petitioners harbored serious concerns regarding the terms of each successive plea offer and that the Petitioners had a strong desire to take the case to trial. The Court does not credit the Petitioners' testimony that they desired to plead guilty, since it is unsupported by the documentary evidence and is contradicted by Petitioners' admissions that they had significant concerns regarding the implications of the plea offers. Thus, since the outcome could not have been different, there was no actual prejudice to Petitioners.

Second, the Court finds that each of the attorneys who represented Petitioners provided adequate assistance throughout the plea process. The Court credits the statements of the testifying attorneys who each provided detailed descriptions of the advice and council they provided to the Petitioners regarding the strength of the government's case and evidence, the terms of the plea offers, and the consequences of pleading guilty as opposed to standing trial.

The Court finds that the Petitioners' attorneys adequately advised the Petitioners of the strength of the government's case against them. The testimony presented at the evidentiary hearing demonstrated that the Petitioners had multiple opportunities to review the evidence against them well in advance of the trial.

14

These opportunities included the Petitioners' presence at and active participation in lengthy preliminary hearings for the state and federal cases. Evidence and testimony at the hearing demonstrated that Ms. Taylor, Mr. Pritchard, Mr. Khouri, and Mr. Iweanoge all discussed the nature and strength of the government's case with the Petitioners, reviewed discovery with them, and investigated Petitioners claims for their defense and discussed the viability of those defenses with them.

The Court also finds that the Petitioners were adequately advised about the potential post-trial sentences they could receive. The testimony and evidence produced at the hearing sufficiently established that the Petitioners' attorneys adequately explained the sentencing guidelines related to each of the charged offenses and the potential sentencing consequences that would result from going to trial instead of pleading guilty.

Mr. Pritchard testified that he explained to Aisha the operation of the federal sentencing guidelines, the consequences of allowing the plea offer to expire, and the increase to the sentencing guidelines that could occur if she went to trial. Mr. Iweanoge likewise discussed the sentencing guidelines with Irvine. Mr. Khouri testified that in his first meeting with the Petitioners, he found them to be very knowledgeable about the sentencing guidelines and details of the offered plea agreement.

He testified that he explained these guidelines further to them and the possible enhancements that could apply. He told the Petitioners that they were likely to receive a 12 year sentence based on the guideline range. Mr. Khouri further testified that the Petitioners told him their previous attorneys had already explained their potential sentencing exposure to them, and that they had retained Mr. Khouri specifically because they wanted a trial.

Finally, the Court finds that the Petitioners' attorneys regularly and timely communicated with the Petitioners regarding the various plea offers and terms. The Petitioners' attorneys forwarded copies of the plea offers and paperwork to the Petitioners via email, worked to negotiate more favorable terms based on the Petitioners' concerns, and consistently advocated to keep plea offers on the table. At the evidentiary hearing, Irvine confirmed receipt of several plea offers. Mr. Kalokoh forwarded a copy of the April 2012 plea offer to Aisha less than a day after he received it. Jail visitor logs confirm that Mr. Iweanoge met with Irvine on at least twenty-nine occasions during the pendency of his state charges alone. The two discussed the December 2011 plea offer, which remained open for three months, but Irvine never accepted it because he maintained that he was innocent. Mr. Iweanoge also discussed the subsequent federal plea offer with Irvine, which he explained was a better

16

offer for him since it did not require him to plead guilty to a state felony. Irvine and Mr. Iweanoge together met with the assigned prosecutor to discuss the outstanding plea offer, demonstrating that Irvine was well aware of the existence of the plea offer and what would be required to accept it.

For the aforementioned reasons, this Court finds Petitioners' claims do not entitle them to § 2255 relief. Therefore, Petitioners' motions should be denied.

An appropriate order shall issue.


_Claude M. Hilton_
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE


Alexandria, Virginia
May _29_, 2018